# Exhibit 2

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4      IQE KC, LLC,                    )
                         Plaintiff,    )
5                                      )
                                       )
6      vs.                             )  Miscellaneous Action
                                       )  No. 1:24-mc-91053-AK
7                                      )
       AKOUSTIS, INC. AND AKOUSTIS     )
8      TECHNOLOGIES, INC.,             )
                         Defendant.    )
9

10

       BEFORE:  MAGISTRATE JUDGE JENNIFER C. BOAL
11

12

                           MOTION HEARING
13

14

15

           John Joseph Moakley United States Courthouse
16                     1 Courthouse Way
                       Boston, MA 02210
17

18

                         April 24, 2024
19                        2:00 p.m.

20

21

22

23            Transcribed by Valerie A. O'Hara
                    Official Court Reporter
24      John Joseph Moakley United States Courthouse
                       1 Courthouse Way
25                     Boston, MA 02210
               E-mail: vaohara@gmail.com

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3         Sterne, Kessler, Goldstein & Fox, by ROBERT NIEMEIER,
      ESQ., 1101 K Street, NW, 10th Floor, Washington, D.C. 20005;
 4
           Holland & Knight, LLP, by GORDON P. KATZ, ESQ.,
 5    10 St. James Avenue, Boston, Massachusetts 02116;

 6    For the Defendants:

 7         McKool Smith, P.C., by JAMES E. QUIGLEY, ESQ.,
      and JOHN B. CAMPBELL, ESQ., 303 Colorado Street, Suite 2100
 8    Austin, Texas 78701.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

PROCEEDINGS

1
2    THE CLERK:  Today is April 24th, 2024 and we are
3 on the record in the matter of IQE KC, LLC vs. Akoustis.
4    Technology, Inc., Case Number 24-MC-90153.
5    Will counsel please identify yourselves for the
6 record.
7    MR. NIEMEIER:  This is Robert Niemeier with
8 Sterne, Kessler, Goldstein & Fox on behalf of plaintiff,
9 IQE.
10:26AM 10    MR. KATZ:  And Gordon Katz from Holland & Knight
11 for IQE.
12    MR. QUIGLEY:  James Quigley from McKool Smith,
13 and with me is John Campbell from McKool Smith as well.
14    THE COURT:  Good afternoon, everyone.  And I did
15 just want to mention before we start that Ms. Early, who I
16 understand has been involved in the case, she and I serve
17 on an editorial board together.  I don't think that's a
18 basis for recusal but I thought I would just mention it in
19 case anyone had any questions about that.
10:29AM 20    So it is IQE's motion, so I'll hear from you
21 first.
22    MR. NIEMEIER:  I'll just pose this now.  So there
23 was a request to transfer from Akoustis, so I don't know
24 if you wanted to hear about that first or if you would
25 just like us to talk about the merits of the motion.

1          THE COURT:  However you would like to proceed.

2          MR. NIEMEIER:  Okay, that's fine.  We'll proceed

3  and then we can take whatever issues on rebuttal we need

4  to.

5          So we're here today on IQE's motion to quash the

6  subpoena.  The subpoena was issued by Akoustis on a

7  related patent litigation in Eastern District of Texas.

8          The subpoena seeks IQE's most sensitive trade

9  secrets.  It seeks financial information, it seeks patent

10:33AM 10  evaluation information, all of which is overbroad, much of

11  which is wholly irrelevant to the claims in the underlying

12  action, and all of which is extremely burdensome, unduly

13  so to IQE, and so on that basis, the subpoena should be

14  quashed as unduly burdensome.  It should also be quashed

15  as calling for the disclosure of IQE's trade secrets and

16  confidential information.

17          I'd like to explain a little.  So the subpoena I

18  think can be broken down into two sort of chunks of

19  documents.  One is the growth recipes and the other sort

10:40AM 20  of everything else, other technical documents, financials

21  under communications, that sort of thing.

22          The growth recipes are essentially the secret

23  sauce to IQE's business.  IQE makes wafers that are used

24  in semiconductors.  There are very few companies in the

25  world that do this.  It produces these wafers by building

1    layers, sometimes only atoms thick, and specific

2    crystalline structures on top of a substrate, and this is

3    very, very difficult to do.  It requires a lot of trial

4    and error.  It takes a long time to develop this

5    technology.

6          The growth recipe is essentially the culmination

7    of that.  It says here's how you build this wafer.  It has

8    the steps that you would perform, how long you perform for

9    it, what temperature, what reactants are used, everything

10:44AM 10   you would need to know.

11         This is -- it can't really be overstated how

12   sensitive this information is to IQE.  Were it to get out,

13   it would considerably undermine IQE's position in the

14   market, and the issue here is Akoustis has proposed

15   treating it as source code, which is the highest level of

16   protection under the protective order in the underlying

17   case in Texas.

18         The issue is the growth recipes for each wafer

19   could be reduced to a matter of a few pages.  Often in

10:46AM 20   protective orders for source code, you have limitations on

21   printing on the order of hundreds pages of total or 20 or

22   50 or some number of pages consecutively.

23         In that case, it would be possible to print out

24   the entire recipe, and so that would pose a much greater

25   danger of disclosure and competitive harm to IQE vs. your

1   traditional source code, which has little value and

2   discrete chunks that may be only one or two or 10 pages of

3   something that could be millions of pages, like a

4   traditional source code often is.

5        So there is really no way under the protective

6   order to adequately protect this.  The protective order

7   also --

8        THE COURT:  Just so I understand, I thought in

9   your motion papers you had suggested that there were

10:48AM 10   protections that you might want that might answer your

11   concerns but that the other side had not agreed to it.  So

12   is what you're saying now is that there are no

13   protections?

14        MR. NIEMEIER:  So there are no protections that

15   will adequately protect it.  What we had offered

16   previously was the one product, we would make that recipe

17   available, and that was sort of as a way to cooperate and

18   hopefully, you know, resolve this and avoid the risk that

19   all of the growth recipes would be subject to disclosure

11:08AM 20   and potential, you know, leakage.

21        So the measures that we had suggested for that

22   recipe, it would not be our position that they would

23   adequately protect the recipe.  That was a compromise we

24   were willing to make to avoid the risk of a larger

25   disclosure.

1          So the proposed also does not apply to trial

2    proceedings, it covers discovery.  I believe Judge

3    Gilstrap is presiding over the case in Texas, and it would

4    be entirely within his discretion to leave the courtroom

5    open at trial or to permit disclosure of any confidential

6    information that he saw fit, and so IQE really has no way

7    to ensure that even if the folks at Akoustis and everyone

8    else involved in that case, you know, abided by the

9    protective order stringently that these materials wouldn't

11:13AM 10   ultimately be disclosed either to the business people at

11   Akoustis or to the defendant Qorvo or to anybody who was

12   attending that trial, and we have no way to protect that.

13          They've suggested in their briefing that we

14   could attend trial and represent our own interests in that

15   respect, but at the end of the day, it will be the

16   District Judge who makes the call, so even if we were

17   there, which itself would be a burden, we're not

18   protected.

19          So the lack of adequate protections in the

01:01PM 20   protective order and the lack of ways that it could be

21   modified to offer that protection, that constitutes an

22   enormous burden to IQE, and so that, we would argue,

23   constitutes reason to quash the motion and would also

24   constitute a basis to quash the motion under the trade

25   secret exception under Rule 45.

1          THE COURT:  So if I understand correctly, there

2    are no additional protections that you've asked for from

3    the other side that they have not agreed to?

4          MR. NIEMEIER:  We had proposed, I believe,

5    limiting, prohibiting printing of the pages.

6          THE COURT:  But with respect to the one product?

7          MR. NIEMEIER:  With respect to the one product.

8          THE COURT:  But you haven't proposed anything

9    with respect to all the products or the other information?

01:03PM 10          MR. NIEMEIER:  That's correct.

11          THE COURT:  Okay.  Anything else?

12          MR. NIEMEIER:  Would you like me to address the

13   transfer motion now?

14          THE COURT:  Yes, that would be fine.

15          MR. NIEMEIER:  So the transfer motion, Rule 45

16   requires there to be exceptional circumstances to transfer

17   subpoena from the court of compliance to the issuing

18   court.  Here, I think it's pretty clear there are no

19   exceptional circumstances.

01:04PM 20          Akoustis has pointed to a decision made by the

21   Judge in Texas relating to the scope of the accused

22   products, and they're concerned that that issue would need

23   to be relitigated in this court.  That is not the case.

24   We are not disputing the scope of the accused products at

25   this point, so that court's decision wouldn't have any

1    bearing.  There wouldn't be any chance of an inconsistent

2    decision.

3         They've also indicated that they've issued a

4    similar subpoena to the one issued to IQE to another

5    party, a competitor of IQE's called Wolfspeed, and the

6    Wolfspeed subpoena, I understand, is or was at the time of

7    briefing being negotiated, and there was potential that

8    Wolfspeed could challenge that subpoena similar to how

9    we're here today.

01:07PM 10         And they suggest that these subpoenas should be

11   transferred to Texas to avoid having to relitigate sort of

12   the same issues in multiple venues, but I don't think

13   that's an issue.  As far as we know, Wolfspeed has not

14   filed a motion to quash or sought a protective order for

15   the subpoena, and even if they did, you know, the factual

16   underpinnings of each party's situation are different, and

17   they would need to be resolved on the merits regardless of

18   whether both motions were heard in Texas or his motion was

19   here and the Wolfspeed one heard in its compliance court.

01:09PM 20         THE COURT:  So in terms of also the exceptional

21   nature, I mean, you've made argument that the gross

22   recipes are something of particular importance to IQE, so

23   why wouldn't that be an exceptional circumstance that this

24   product is so important to the company that it really, the

25   issues with respect to it should be decided by the court

1    that's going to conduct the trial and you can make them

2    aware of these exceptional issues?

3              MR. NIEMEIER:  I think the growth recipes are

4    exceptional to IQE as far as its concern with this case.

5    I don't think that would rise to an exceptional

6    circumstance in the transfer analysis.  I think generally

7    that's referring to whether or not decisions in this court

8    would contradict or impinge on the management of the case

9    from the court where the case is pending.

01:11PM 10             I think this court would have all the information

11    in front of it that it would need to make a decision on

12    that.  I don't believe that the court in Texas would have

13    any further familiarity or competency with the issues to

14    decide.

15             THE COURT:  But you would be making a pitch for

16    how that court would govern the trial itself?

17             MR. NIEMEIER:  I'm not sure, how do you mean?

18             THE COURT:  Well, in your argument, let's say the

19    case was going to be heard by Judge Kelley, you would be

01:11PM 20   making an argument that you needed extra protections at

21    trial?

22             MR. NIEMEIER:  I see.  Yes, that's correct.

23             THE COURT:  I mean, I'm not really in a position

24    to bind the trial court on that.

25             MR. NIEMEIER:  Certainly.  And I think ultimately

1     if we had to produce these materials, I think we would go

2     back and work with Akoustis to try and resolve that, you

3     know, by agreement without involving the Court, but, yes,

4     it's not clear to me as a nonparty whether we would have

5     any ability to press for modifications to the protective

6     order in Texas, whether or not the case was transferred

7     there or not.

8              THE COURT:  Right, perhaps even better reason to

9     have this argued in front of the court there.  So in terms

01:12PM 10    of Akoustis filed a judicial notice I believe on the same

11    day or around the same day as your reply motion was filed.

12    Do you want to comment on the judicial notice and the

13    purposes for which Akoustis said they filed it?

14             MR. NIEMEIER:  My understanding is they filed the

15    request for judicial notice of the IPR petition that was

16    filed by IQE.  We don't have any objection to the request

17    for judicial notice.  I think it's public record that IQE

18    filed the IPR petition against the underlying patent.

19             THE COURT:  Right.  I think, I could be wrong,

01:13PM 20    but I took their argument to be that you're not a

21    disinterested party in the litigation.

22             MR. NIEMEIER:  And I would disagree with that.  I

23    think it's a little bit backwards to say that because we

24    were subpoenaed and, you know, are being pushed to produce

25    the sensitive information and then in response to that

1    file these motions and filed the IPR that we become an

2    interested party.

3            You know, the interest that I think they're

4    suggesting arises out of this subpoena and IQE's interest

5    of avoiding disclosure of information.  I think it would

6    be a little bit backwards to suggest that by imposing in

7    whatever way you can request for this discovery that you

8    become interested and then subject to a broader scope of

9    discovery.

01:17PM 10           THE COURT:  I could be wrong, I thought they were

11   arguing sort of the opposite because you filed the action

12   in front of the patent board that that was a showing of

13   interest that affected how I should view your arguments

14   here.

15           MR. NIEMEIER:  So the IPR was filed after the

16   subpoena, and after all of this sort of we couldn't reach

17   an agreement and there was a motion to quash.  It's

18   another attempt certainly to prevent having to disclose

19   this information.  If the IPR were successful, it might

01:18PM 20   dispose of the underlying action, so I think our position

21   would be that it shouldn't be held against us that we're

22   imposing the subpoena and the discovery efforts with what

23   means we have available.

24           THE COURT:  So, in terms of burden, and I don't

25   believe I heard you talk about burden.  If I understand

1    correctly, you would be producing the documents

2    electronically, correct?

3              MR. NIEMEIER:  So for the documents, leaving

4    aside the growth recipes, yes.

5              THE COURT:  Right.

6              MR. NIEMEIER:  They would be, to the extent

7    they're in electronic form, which I believe most of them

8    would be, we would produce them electronically.  For the

9    growth recipes, if we were in a position where we had to

01:19PM 10   produce them, we would likely do some sort of an

11   inspection, either at our office in Washington D.C. or at

12   some other location, and we would need to negotiate, I

13   think, whether and to what extent any printing of those

14   could be done or copying, and so those copies would

15   probably be in paper format, as is often done with source

16   code.

17             THE COURT:  Okay.  And you have made some

18   allusion to some potential witnesses testifying in Texas,

19   but at this point there's no request for testimony?

01:22PM 20         MR. NIEMEIER:  Correct.  The subpoena did not

21   include a request for testimony.

22             THE COURT:  And I think you had made an argument

23   that Akoustis could get the information, a lot of the

24   information from Qorvo, but I guess how does that apply to

25   the growth recipes, which sounds like you haven't shared

1    with anyone, according to your papers?

2            MR. NIEMEIER:  That's correct.  They would not be

3    able to obtain the entirety of the information that's in

4    the growth recipes from Qorvo, at least we would hope not.

5    They are able to get information from Qorvo on sort of the

6    structure of the products that are being accused.  They're

7    able to get samples of the products, I would presume, from

8    Qorvo that they could then perform the sort of testing

9    that they did in the complaint, but they would not be able

01:23PM 10    to get exactly the information that's in the growth

11    recipes from Qorvo.

12            THE COURT:  All right.  Anything else?

13            MR. NIEMEIER:  On burden, I would just say, you

14    know, I think in their briefing, they made light of sort

15    of the collecting of the growth recipes and said, you

16    know, it would be as simple somebody walking to the

17    machine and downloading it and then sending it off.  I

18    think it's a little more involved than that.

19            So these machines, the growth recipes are only

01:24PM 20    stored on the reactors that are producing these materials.

21    They're not saved in any kind of other location, and the

22    reactors are behind sort of the secure perimeter in the

23    facility, and the only people who have access are the

24    technicians who operate the reactors, and so what would

25    have to happen is a technician would have to shut down

1    their machine to travel to these other reactors to

2    retrieve the recipes one-by-one, and, you know, as they're

3    manufacturing, as the reactors are running, the

4    technicians have to stay and monitor it, and since this

5    technician would have to leave to perform the collection,

6    that machine would have to be shut down, and so that would

7    be time when IQE is not able to manufacture using that

8    equipment, and so there is some fairly substantial burden

9    having a technician go from machine to machine and

01:27PM 10    download each of these recipes individually, and there's

11    also a burden of identifying which wafers are involved.

12            The supplied products definition in the subpoena

13    is quite broad, and it doesn't tie anything to particular

14    Qorvo models, so in the underlying litigation, I

15    understand Akoustis has accused a long list of several

16    thousand Qorvo products.  IQE doesn't have visibility into

17    what Qorvo product numbers correspond to which wafer, and

18    so what we have to do is go through all of the wafers that

19    have been sold to Qorvo and figure out whether they meet

01:29PM 20    sort of the functional definition that's in the subpoena

21    for the supplied products, and so that would be sort of a

22    manual process as well.

23            THE COURT:  But I have no concrete estimate of

24    the cost of that burden, right, before me?

25            MR. NIEMEIER:  Yes.  I don't know what it would

1    cost.  It would be a number of person hours, and I don't

2    have in front of me what it would cost for the time the

3    reactor was down.

4         THE COURT:  Okay.  Thank you.  Yes.  Who is going

5    to speak on behalf of Akoustis?

6         MR. QUIGLEY:  Your Honor, Jim Quigley of McKool

7    Smith.  Let me actually, is it okay if I pass up some

8    slides?

9         THE COURT:  No.

01:32PM 10    MR. QUIGLEY:  No slides?

11        THE COURT:  No, I find that distracting during

12    oral agreement and not typically very useful.

13        MR. QUIGLEY:  Sure.  Well, I'll start at the

14    beginning of where I was going to start, and I'll hit on

15    some of the points opposing counsel mentioned just now and

16    some of the issues that you raised.

17        Just as some background, Akoustis sued Qorvo in

18    the Eastern District related to a patent that a prior

19    Qorvo entity was the exclusive licensee on.  Akoustis, for

01:33PM 20    all good reasons, believed Qorvo was making this stuff

21    because Qorvo's website says Qorvo was making this.

22        So we sued Qorvo in the Eastern District where

23    their facility is, and we asked Qorvo for information like

24    growth recipes, manufacturing details, and Qorvo says we

25    don't have it, actually, you know, you should talk to our

        1    wafer suppliers, one of them is IQE and pointed us to, I

        2    believe it's in the record as one of our exhibits, a press

        3    release from 2012 where a wafer facility, it doesn't say

        4    it's GAN but a wafer facility was transferred from Qorvo

        5    to IQE.

        6           THE COURT:  And how many suppliers are we talking

        7    about?  I understand there's Wolfspeed as well, but are

        8    there others?

        9           MR. QUIGLEY:  Those are the two that are being

01:38PM 10   focused on right now.

       11           THE COURT:  Okay.

       12           MR. QUIGLEY:  And so what we did is we went to

       13   the suppliers with subpoenas, and I think with Wolfspeed

       14   we tried to informally work it out because there were some

       15   other negotiations that had already happened, but they

       16   have been subpoenaed as well, asked them, you know, for

       17   this information.

       18           At this point, we've actually started to get some

       19   growth recipe information from Wolfspeed, you know, they

01:39PM 20   printed it out and FedExed it to our expert, but IQE on

       21   the other hand has been more resistant here, and, you

       22   know, so we served the subpoena on IQE in October 2023.

       23   We got objections, we tried to work with IQE to get

       24   something.  IQE took the position, like Qorvo was at that

       25   same time, that the only accused product in the case was

the QPD 1000 product, so IQE and Qorvo refused to give us
anything beyond that.

You know, January 10th of 2024, we have a hearing
in front of Judge Payne and Judge Payne, you know, denies
Qorvo's motion to strike by saying, of course, the other
products are at issue.  You're going to have to turn over
that information.

We told IQE this, so IQE promptly went from
offering one growth recipe in Washington D.C. to offering
nothing at all and filing a motion in this court.

I want to be clear, you know, we've never taken
the position we won't agree to further protections.  Our
issue in December and in January were that we weren't
going to send an expert 2500 miles on an airplane to look
at one recipe when there are others that are at issue.
And I don't think that there are dozens and dozens and
dozens of wafers at issue here, my understanding is it's
handfuls.

Now, there may be, you know, the need to grab
different versions of those recipes for those handfuls of
wafers, but this isn't, you know, thousands and thousands
of different wafers that are being made as far as I'm
aware.  IQE can correct me if I'm wrong.  So I think that
goes, you know, to the unduly burdensome argument that IQE
is making.  It's not actually that many wafers.

                   1          THE COURT:  And do you anticipate deposition

                   2    testimony or other testimony?

                   3          MR. QUIGLEY:  So we haven't served the deposition

                   4    subpoena, and to the extent we do, the way I would

                   5    typically handle this is I would look for a declaration

                   6    just authenticating whatever the documents are that you

                   7    provided.  You know, one of the points I wanted to raise,

                   8    and, you know, counsel hit on this, and you, your Honor,

                   9    hit on this, I don't think IQE is a truly disinterested

        01:45PM   10    party in this case.

                  11          THE COURT:  Well, I think it's your argument.

                  12          MR. QUIGLEY:  Well, he hit on it and responded to

                  13    it --

                  14          THE COURT:  Yes.

                  15          MR. QUIGLEY:  -- but, you know, mere days after

                  16    the briefing on this motion to quash is complete, IQE

                  17    files an IPR petition, and I don't know how acquainted

                  18    your Honor is with IPR petitions, but it's a $40,000

                  19    filing fee, probably tens of thousands of dollars on

        02:24PM   20    expert fees, maybe another six figures in attorney's fees.

                  21          I mean, that's a lot of money for a disinterested

                  22    third party to be spending fighting a patent, and, you

                  23    know, coincidentally, IQE hired the same expert that Qorvo

                  24    is using in another case for that IPR.  Coincidentally,

                  25    IQE asserted the same primary prior art references that

1   Qorvo is asserting in the Eastern District case against

2   the same patent.

3          And so, you know, from what we see over time,

4   there is some coordination going on between IQE and Qorvo.

5   I don't know what that is.  It's a customer supplier

6   relationship.  It could be close, it could be some, you

7   know, some fighting, but IQE is certainly in the loop on

8   stuff that's happening, and so to the extent there are

9   concerns on, you know, harm that's going to befall IQE

02:28PM 10  here, you know, by disclosing these recipes, I would just

11  say that there's no competitors, IQE's competitors are not

12  involved in this case.  This is Qorvo and Akoustis.  There

13  hasn't been an allegation that there are actually

14  competitors.

15         Akoustis has always been willing to agree to

16  additional protections for these growth recipes.  I would

17  expect nothing less.  I mean, I agree these are sensitive.

18  We'll review them on a source code computer.  We won't

19  print more than we need to print.  The Eastern District

02:29PM 20  protective order that's I think in the record as our

21  Exhibit 28 has, you know, specific requirements that you

22  not print things just to review them elsewhere.

23         THE COURT:  And what about the argument that the

24  protective order only covers precisely discovery?

25         MR. QUIGLEY:  So, that's correct, there's a

1    paragraph in the protective order that says that, you

2    know, parties can use designated material at trial.  I

3    agree.  I think as your Honor noted, that may be, you

4    know, a reason to transfer, you know, this motion to quash

5    or this subpoena to the Eastern District because the

6    Judges there are going to be able to rule on those

7    protection issues at trial.

8            And we, for Akoustis, are more than willing to

9    work with IQE to seal the courtroom and that sort of

02:30PM 10   thing.  I have no interest in having an open courtroom

11   when somebody's sensitive information is being discussed.

12   That's not what I would like to do.

13           THE COURT:  What is the status of the Wolfspeed

14   subpoena?  I understand there's been some discussion that

15   you've been able to work some of the issues out.

16           MR. QUIGLEY:  We have received some growth recipe

17   information.  We've worked with them to narrow down what

18   it is we're going to receive, and I believe we're

19   receiving more after we finalize some of the details.

02:31PM 20           THE COURT:  And what in terms of burden on IQE,

21   what, if you know, is the Eastern District of Texas's

22   policy or maybe it's these particular Judges's policies

23   with respect to conducting a hearing by Zoom?

24           MR. QUIGLEY:  I don't know that offhand, your

25   Honor, I apologize.  I do want to discuss the burden issue

1    just momentarily.  I heard counsel explaining, you know,

2    what some of the burden is.  I think if you go and look at

3    Exhibit 3 to their motion, there's not actually that

4    detail about the burden, it just says there's going to

5    need to be an extraction and a conversion and sending

6    files to counsel.

7         I don't think there's anything in the record

8    about the time or expense or, you know, how tough it

9    actually is.  You know, obviously, we'll work with IQE to

02:33PM 10    make it as simple as possible just to get that information

11    on a source code review computer, somewhere that is

12    convenient for IQE.

13         THE COURT:  And what about IQE's argument that

14    the magistrate judge's decision in Texas about the accused

15    products is not similar to the issue that's before me in

16    terms of relevance?

17         MR. QUIGLEY:  So I do disagree.  I heard earlier,

18    and I think this is a quote, that IQE is not disputing the

19    scope of the accused products, but I think IQE actually

02:35PM 20    was doing that in its papers in this case trying to

21    suggest that the materials that Akoustis is entitled to

22    via subpoena are narrower than in the Eastern District.

23         I think if you look at accused instrumentalities

24    definition and supply products definition, both of them

25    have a substantive component, which is specific epitaxial

1  levels with specific substrates, and they both have a time

2  component from April 2017 onwards.  We are seeking

3  material from IQE that is overlapping with the material

4  that we sought from Qorvo that Qorvo doesn't possess.

5       THE COURT:  And IQE also says you should get

6  certain information from Qorvo, so, for example, some of

7  the financial documents seem to be readily available from

8  Qorvo.

9       MR. QUIGLEY:  So I agree there's some information

02:36PM 10  that we can obtain from Qorvo.  I think some of these

11  topics cover things that Qorvo may have but IQE is going

12  to uniquely possess.  I can simplify things.  We will

13  focus on topics 3, 4, 6 and 16, which are the growth

14  recipe topics according to IQE, and I can't get that from

15  anyone besides IQE.

16       THE COURT:  Meaning that you're not contesting

17  the motion to compel except on 3, 4, 6 and 16 or you're

18  just --

19       MR. QUIGLEY:  The motion to quash.

02:38PM 20       THE COURT:  The motion to quash.

21       MR. QUIGLEY:  We'll drop the rest of the

22  requests.

23       THE COURT:  Okay.  Let me see if I have anything

24  else.  And just to be clear, I think this is consistent

25  with what IQE said, but you're unable to obtain the

1    information concerning growth recipes from any other

2    source?

3              MR. QUIGLEY:  Correct.  We can do reverse

4    engineering, like we talked about in the papers, but

5    reverse engineering can tell you really basic information.

6    You know, if you say I want to know if there's carbon or

7    hydrogen or nitrogen in it, it can give you some idea of

8    whether that material is in there and where it is, but it

9    can't tell you things like temperature and pressure and

02:41PM 10   specific reactants that were used.

11             THE COURT:  Thank you.  Anything further from

12   IQE?

13             MR. NIEMEIER:  Yes, just briefly.  Akoustis, they

14   mentioned a facility, I think, the manufacturing facility

15   that was transferred from Qorvo to IQE.  That was a number

16   of years ago.  That facility I understand has since been

17   closed, so there are no wafers involved being made there,

18   and I don't think it has any relevance as to whether or

19   not we're an interested party.

02:42PM 20            You know, he mentioned the cost of the IPRs.  I

21   wanted to underline that's correct.  It's very expensive,

22   and that's just how seriously IQE is taking the disclosure

23   of this information, that these costs are worth it to

24   their mind because of the risk of what could happen if

25   these growth recipes get out.

1          On the transfer issue, I think you have raised

2     the point of wouldn't it make sense to transfer if there's

3     going to be a fight over the protective order there?  I

4     think I would just point out that if the subpoena were

5     quashed, there wouldn't be any need to get to the issue of

6     revising the protective order because we wouldn't have any

7     qualm with the current order, there wouldn't be anything

8     to produce.

9          And then just on the reverse engineering point,

02:45PM 10     the analysis that they performed on the complaint, I

11     think, you know, they pointed out there's certain things

12     from that that we can't find, and they're saying that

13     these are necessary for the infringement analysis, but

14     they filed a complaint based on those reverse engineering,

15     and they have their obligation to believe there's a basis

16     for accusing an infringement.

17          They're saying that this testing didn't give them

18     information on X, Y, Z limitations form the patent, then

19     what was the basis for filing the complaint?  I think it's

02:46PM 20     a little bit two-faced to come in now and say this testing

21     wasn't sufficient for us to show infringement and we need,

22     you know, this very sensitive information from you, IQE to

23     build our case out.

24          THE COURT:  All right.  Thank you, I will take it

25     under advisement.

1          THE CLERK:  Court is in recess.  All rise.

2          (Whereupon, the hearing was adjourned at 2:35 p.m.)

3

4                    C E R T I F I C A T E

5

6   UNITED STATES DISTRICT COURT )

7   DISTRICT OF MASSACHUSETTS ) ss.

8   CITY OF BOSTON )

9

10         I do hereby certify that the foregoing transcript,

11  Pages 1 through 26 inclusive, was recorded by me

12  stenographically at the time and place aforesaid in

13  Miscellaneous Action No. 1:24-mc-91053-AK, IQE KC, LLC, vs.

14  AKOUSTIS, INC. AND AKOUSTIS TECHNOLOGIES, INC.,

15  and thereafter by me reduced to typewriting and is a true and

16  accurate record of the proceedings.

17         Dated April 30, 2024.

18

19                    s/s Valerie A. O'Hara

20                    _____

21                    VALERIE A. O'HARA

22                    OFFICIAL COURT REPORTER

23

24

25